**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **JIMMY DALE PALMER, et al.,** ) | |
| ) | |
| ) | Case No: 03-CV-0498-CVE-PJC |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | |
| ) | Consolidated with: |
| **ASARCO INCORPORATED, et al.** ) | |
| ) | Case No: 03-CV-0565-CVE-PJC |
| ) | Case No: 03-CV-0566-CVE-PJC |
| **Defendants/Third-party Plaintiffs,** ) | Case No: 03-CV-0567-CVE-PJC |
| ) | Case No: 03-CV-0569-CVE-PJC |
| ) | |
| v. ) | |
| ) | |
| **UNITED STATES OF AMERICA, et al.** ) | |
| ) | |
| ) | |
| **Third-Party Defendants.** ) | |

**OPINION AND ORDER**

Now before the Court is Defendants' Motion to Exclude Portions of the Expert Testimony of Thomas H. Mayor, Ph.D. and Brief in Support Thereof (Dkt.# 534). Defendants ask the Court to disallow Thomas H. Mayor, Ph.D. ("Dr. Mayor") to testify that a negative net discount rate should be applied to arrive at present value of lost future earnings.

**I.**

The plaintiffs in this case are seven children who reside in Picher and Cardin, Oklahoma. This area, now known as the Tar Creek Superfund Site, was the site of historical mining operations that peaked around 1920. Picher and Cardin are located near mining waste in the form of chat piles and tailings ponds. Through expert testimony, plaintiffs intend to establish that they were exposed

to low levels of lead since their birth. They allege that lead exposure has caused an array of subtle neurocognitive injuries including learning disabilities, behavioral disorders, and reduced IQ.

Plaintiffs have retained an economics expert, Dr. Mayor, to testify about the proper measure of damages in this case. Dr. Mayor is a professor of economics at the University of Houston, and he currently serves as the chair of the department of economics. Plaintiffs intend to use Dr. Mayor's testimony to show the present value of their future lost earnings. When calculating plaintiffs' total claim for lost earning capacities, Dr. Mayor relied on the expert report of Carl Hansen, Ph.D. ("Dr. Hansen"), who determined that plaintiffs will annually lose about $11,976 to $13,714 in wage earning capacity.[1] Dr. Mayor used the mid-point of this range, $12,845, with a 16% allowance to account for typical fringe benefits provided by many employers.[2] He concluded that plaintiffs face an annual loss of $14,900 in current dollars, and defendants do not challenge this figure. Dr. Mayor determined that the male plaintiffs' work life expectancy is 39.8 years, and the female plaintiffs' is 33.6 years, at age 18. He then adjusted this number to account for future "cost of living" wage growth and for interest earned on safe investments, such as United States Treasury bills.

He made two separate calculations based on two different cost of living adjustments. First, he used historical data going back to 1947 and found that the return on safe investments was one percentage point lower than the annual rate of salary growth, and this resulted in a net discount rate of -1%. Second, using data going back to 1970, he performed the same analysis and found that a

---

[1]   Dr. Hansen was hired by plaintiffs as a vocational rehabilitation expert. He reviewed the reports of plaintiffs' neuropsychology experts, Bonny Forrest, J.D., Ph.D., and Jeanette Wasserstein, Ph.D., and used the Dr. Forrest's and Dr. Wasserstein's assessment of plaintiffs' alleged injuries to calculate an annual loss of earning capacity for each plaintiff.

[2]   Dr. Mayor used statistics provided by the Department of Labor to account for the value of typical fringe benefits provided by employers.

net discount rate of +1% should be applied.[3] Defendants object to Dr. Mayor's first opinion using historical data going back to 1947. They argue that Dr. Mayor's methodology is unreliable, and his application of a negative net discount rate is not supported by caselaw.

## II.

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the Supreme Court held that district courts must initially assess the admissibility of expert testimony under Fed. R. Evid. 702. In <u>Bitler v. A.O. Smith Corp.</u>, 400 F.3d 1227 (10th Cir. 2005), the Tenth Circuit discussed the role of district courts when considering a <u>Daubert</u> challenge. First, the court should make a preliminary finding that the expert is qualified to testify. Next, the proponent of expert testimony must establish that the expert used reliable methods to reach his conclusion and that the expert's opinion is based on a reliable factual basis. The Tenth Circuit cited four factors that district courts should apply to make a reliability determination:

> (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

<u>Id</u>. at 1233 (citing <u>Daubert</u>, 509 U.S. at 593-94). The Tenth Circuit was clear that "a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." <u>Id</u>. In other cases, the Tenth Circuit has emphasized that any analytical gap in an expert's methodology can be a sufficient basis to exclude expert testimony under <u>Daubert</u>. <u>Trucks Ins. Exchange v. MagneTek, Inc.</u>, 360 F.3d 1206, 1212-13

---

[3] Based on his calculation using a -1% discount rate, Dr. Mayor opined that present value of the total future lost earnings for all 7 plaintiffs would be $5,036,943. Applying a +1% discount rate, he concluded that the present value of plaintiffs' future lost earnings would be $3,009,667.

(10th Cir. 2004); Goebel v. Denver & Rio Grande Western R. Co., 346 F.3d 987, 992 (10th Cir. 2003). Under Daubert, "'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" Mitchell v. Gencorp Inc., 165 F.3d 778, 783 (10th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994)).

**III.**

Defendants object to Dr. Mayor's application of a negative net discount rate to determine the present value of plaintiffs' claim for future lost earnings, and assert that his opinion considering inflationary trends dating back to 1947 is unreliable. They argue that Dr. Mayor's determination of future lost earnings using a negative discount rate is not supported by caselaw or other literature analyzing this precise issue, and he should be precluded from testifying to this rate. In essence, Dr. Mayor intends to offer an expert opinion that plaintiffs will lose money by obtaining a lump sum payment and investing that money, and they should be given $2 million more to account for this alleged loss. On the other hand, a positive discount rate accounts for the positive effects of investment and reduces a lump sum payment accordingly. See Hoskie v. United States, 666 F.2d 1353, 1355 (10th Cir. 1981).

Defendants argue that application of a negative net discount rate is not reliable and underrepresents historical wage growth. Plaintiffs have responded with many arguments that are non-germane to the argument raised by defendants, and they do not clearly establish that Dr. Mayor's use of a negative discount rate is reliable.[4] In fact, plaintiffs' response is largely non-

---

[4] Plaintiffs raise several issues that defendants did not address in their motion, such as Dr. Mayor's qualifications and his reliance on Dr. Hansen's report. Defendants did not challenge Dr. Mayor on those grounds, and the Court will not address these arguments.

4

responsive. Plaintiffs argue that defendants' objections to Dr. Mayor's testimony go to the weight of his testimony, not its admissibility, but plaintiffs are incorrect. Defendants have properly focused their arguments on the reliability of Dr. Mayor's application of a negative discount rate, and this is clearly a proper subject for a Daubert motion. Plaintiffs also attempt to support Dr. Mayor's testimony with a supplemental affidavit, dated June 14, 2007. The affidavit contains additional analysis supporting Dr. Mayor's application of a negative discount rate, but this analysis was not disclosed in his expert report. The supplemental affidavit does not contain any new opinions, and the factual basis for Dr. Mayor's opinion was disclosed in his expert report. In this instance, the Court will not strike Dr. Mayor's supplemental affidavit, but Dr. Mayor's report will be treated as the full statement of his opinions. The Court will refer to Dr. Mayor's June 14, 2007 affidavit to the extent that it clarifies opinions clearly set forth in his expert report.

The Supreme Court has addressed the use of a discount rate when lump sum damages for future lost earnings are awarded. In Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523 (1983), the Supreme Court stated:

> Thus, although the notion of a damage award representing the present value of a lost stream of earnings in an inflation-free economy rests on some fairly sophisticated economic concepts, the two elements that determine its calculation can be stated fairly easily. They are: (1) the amount that the employee would have earned during each year that he could have been expected to work after the injury; and (2) the appropriate discount rate, reflecting the safest available investment. The trier of fact should apply the discount rate to each of the estimated installments in the lost stream of income, and then add up the discounted installments to determine the total award.

Id. at 538. Generally, a positive discount rate between 1% and 3% will be presumptively reasonable, id at 549, and the Tenth Circuit has suggested that even more set-offs may be required. Hull v. United States, 971 F.2d 1499, 1512 (10th Cir. 1992). The Tenth Circuit has affirmed a discount rate as high as 9.5%, although the court suggested that 9.5% was an "exceptionally high discount rate."

Hoskie, 666 F.2d at 1355.  An award for future lost earnings "becomes more speculative as it is projected farther into the future," and courts should not hesitate to apply a higher discount rate to avoid providing the plaintiff a windfall based on nothing more than an expert's guesswork.  Goico v. Boeing Co., 347 F. Supp. 2d 986, 992-93 (D. Kan. 2004).

Plaintiffs rely on a pre-Pfeifer case from the Fifth Circuit, Culver v. Slater Boat Co., 688 F.2d 280, 308-10 (5th Cir. 1982) ("Culver I"), for the proposition that a discount rate of -1.5% to +3% is presumptively reasonable, but plaintiffs' citation is problematic.  The part of the Culver I cited by plaintiffs was withdrawn by the Fifth Circuit in a subsequent opinion, and it is not even valid as persuasive authority.  See Culver v. Slater Boat Co., 722 F.2d 114, 123 (5th Cir. 1983) ("Culver II").  Dr. Mayor relies on Culver II in his June 14, 2007 affidavit.  In Culver II, the Fifth Circuit suggested that a discount rate between -1.5% and +3% would be reasonable in most cases if the tax effects of an award of damages were considered, but the appropriate pre-tax discount rate should be between 1% and 3%.  Id. at 122.  In Dr. Mayor's report, he does not address the tax effects of a lump sum damages award and, under Culver II, the appropriate discount rate should be between 1% and 3%.  Even though Culver II is non-binding precedent, it is the only legal support for plaintiffs' argument and it shows that Dr. Mayor's use of a negative discount rate is not reliable.

The methodology used by Dr. Mayor has been criticized in other cases, and courts have rejected a discount rate determined by referencing statistical data as far back as 1947.  In Trevino v. United States, 804 F.2d 1512 (9th Cir. 1986), the Ninth Circuit found that the district court erred when it applied a negative discount rate based on historical data from 1954 to 1984.  Id. at 1517. The district court applied a -2% discount rate, but the Ninth Circuit held that the district court abused its discretion by using a discount rate based on "assumptions not generally accepted by the

6

courts or economists." Id. The Ninth Circuit noted that the district court considered "aberrational years from 1974-82" in its calculations. Also relevant to this case, the Ninth Circuit rejected a comparison between historical wage growth and the return on the safest investments as a proper basis to determine the discount rate, because wage growth could be due to many factors aside from inflation, such as increased education, training, and experience. Id. at 1518 (citing Sauers v. Alaska Barge & Transp., Inc., 600 F.2d 238, 246 n.15 (9th Cir. 1979)). Although the court did not state that a negative discount rate could never be applied, it found that the district court arrived at an unnaturally low discount rate. Trevino, 804 F.2d at 1519-20.

The same methodology utilized by Dr. Mayor was expressly rejected by at least one other court. Sharian v. United States, 2002 WL 31558047, at *2 (N.D. Cal. 2002) (rejecting comparison of wage increases between 1947-97 and interest rates during same time period as a basis to determine discount rate). Dr. Mayor's expert report does not contain sufficient analysis to justify a -1% discount rate. It would defy the dictates of Daubert to allow application of a negative net discount rate for up to 40 years into the future without a substantial indication that Dr. Mayor's opinion is reliable. Dr. Mayor's report contains two written pages stating his opinions and a cursory analysis, but the report provides little basis to review Dr. Mayor's methodology. While a discount rate of +1% is presumptively reasonable, this Court is hesitant to allow testimony regarding a negative discount rate, because this provides a "double recovery" to the plaintiff. Hull, 917 F.2d at 1512; Trevino, 804 F.2d at 1519. Dr. Mayor has not shown that he has a reliable basis to opine that a negative net discount rate should be applied under the facts of this case, and his testimony on this issue will be excluded.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Exclude Portions of the Expert Testimony of Thomas H. Mayor, Ph.D. and Brief in Support Thereof (Dkt.# 534) is **granted**.

**DATED** this 13th day of August, 2007.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT